v. Russell Vought in his official capacity as Acting Director of the Consumer Financial Protection Bureau and Consumer Financial Protection Bureau. Ms. McArthur for the assailant, Ms. Bennett for the appellee. So before we get started, I just wanted to thank counsel for both sides for the tremendous amount of work that you've been doing on a very tight schedule. I know that the case only arose in the district court, you know, a few days ago and that people have been working extremely hard and we all know that a quick resolution of these matters is important to prevent any irreparable harm and to minimize the extent to which the court is involved in any kind of restrictions on what the executive branch can do. So I just want to appreciate that. I know you're all tired and I'm grateful that you are here and ready to help us out this morning. Mr. McArthur, you may proceed when you're ready. Thank you Judge Fillard and may it please the court. Eric McArthur for the defendant. We are here on an emergency stay motion for one basic reason. The district court's sweeping programmatic injunction goes far beyond any relief that can be justified based upon the purported violations the court identified and it improperly intrudes on the executive's Article II authority to manage its own internal affairs by preventing the Bureau from using lawful tools that agencies possess in order to manage their workforces, to set their priorities, and to shepherd their resources. I want to start out by focusing on what I think are the two key principles that the district court lost sight of here and that should guide this court's inquiry. The first is the basic principle of equity under the law of remedies and that is that an injunction must be tailored to fit the nature and extent of the violation and to address the resulting harm to the plaintiffs. The second is a principle of constitutional dimension and that is that when a court orders relief affecting the internal operations of a coordinate branch of government, it must ensure that it stays in its constitutional lane and does not usurp the lawful discretion the Constitution vests in the President to decide how to execute the laws. The injunction here runs roughshod over both principles. Before you get into the details, can I just ask a couple threshold questions? We're here on a stay and you're limited by the way you've presented stay arguments in brief. So you haven't challenged the district court's framing of the case, which is that this is fundamentally the agency action under review is the alleged attempted plan to just shut down the agency. And you have Lujan and Sewell arguments about that framing, but we take that as a given, right? And on the merits, you haven't challenged the proposition that closing the agency would be unlawful or would cause legal violations, right? And you haven't challenged the findings of fact that there was a plan to close the agency, which persists and would be implemented, but for judicial intervention. So if all of that is right, how could we possibly give you a full stay pending appeal, right? Which means you're free to do what the district court said you would do. As opposed to, let's just debate the scope of the injunction and try to pare it back so that you can't close the agency, but you can do things you can legitimately do, like layoffs and give you lots of layoffs without closing the agency. But we're just talking about scope, not full stay or not. Whether it's full stay or a partial stay, I think Judge Katsas, you are correct. We do dispute all of those things and there will be time enough to lay out our arguments when we have merits briefing on the preliminary injunction. But our primary submission today is that even if you accept all of that arguenda, the injunction that was entered here is unlawful because it goes far beyond what is needed to remedy the violations. And there are two. Which is a scope question, not a just knock out the injunction. I think it is a scope question. That is correct. And there are two violations that the district court found that plaintiffs were likely to establish here. One of them is the February 10th email that acting director Vought sent on that morning, which was his first full business day on the job, in which he directed employees not to perform any work tasks unless they were urgent. So, even suspending my disbelief, Judge Katsas, that that email was a traditionally reviewable final agency action that some plaintiff here has standing to challenge and that was somehow unlawful. Even accepting all of that, the appropriate remedy for that violation would be to enjoin the agency from giving effect to the February 10th email. Of course, the injunction here goes far beyond that. The other violation the district court purported to find here is what it called on page 45 of the opinion, the decision to shut down the agency completely. Again, setting aside that no such decision exists, that would at most justify an injunction that precludes defendants from shutting down the agency while the case is being litigated on the merits. Which would look something like paragraph four of the BI. I think the one piece of this BI that is at least arguably consistent with the two principles that I articulated before is that first clause of item four of the injunction that goes up to the comma. And that's the clause that basically bars defendants from giving effect to that February 10th email. I don't think that's necessary. And if that's right, then likewise any future action that replicates. I think that would be fine. I think if the court stayed this injunction with the exception of that part of number four, that would be fine with us. That really isn't necessary because that email has been long since overtaken by events. But if the court left that part of the injunction in place, that I don't think would be any serious problem for the government. I take the government not to be disputing either paragraph one of the injunction, which requires the defendants and contractors not to delete or destroy data in violation of the Federal Records Act. And in fact, to take the steps to make sure that it has the capacity to preserve data. Is that right? So paragraph one, I don't think imposes any obligations on the agency that don't already exist by virtue of law and defendants intend to comply with the law. And so it's not problematic for that reason. I do think it is problematic in that an injunction that simply says follow the law is generally inappropriate, at least where there's not been a specific finding by the district court that there had been a violation of that provision. But there had been a finding by the district court of an intent, and in fact, action taken to terminate all contracts, including contracts necessary to preserve data. And no steps taken as the agency was being directed to wind down, no steps taken to preserve the data. So I appreciate your saying that that is legally required. But I think it's more than that, that the district judge didn't just come in with some hostility to the new administration and say, I'm going to tell you to comply with the law. There was a two-day full-on factual hearing, and she made fact findings about why she thought this prophylactic was permanently needed, right? And the key word there, I think, is prophylactic, because the district court never found or adjudicated that there was a likely violation of any record-keeping provision. So your position is that that is not implicit in a finding that the plan and the intent continued to be to shut down the entire agency? I think it's not implicit, at least absent some finding that the actions that were taken impaired the agency from fulfilling these obligations, and they failed to meet them. I think part of the problem here is that the district court simply failed to hold plaintiffs to their burden. They're trying to shift that burden over onto us. But it was the burden of the plaintiffs in this forward to come forward with evidence and an explanation of the following nature. If this agency is shut down, here are the discrete agency actions that the agency will be unable to take but is required by law to take. That's the test from Southern Utah Wilderness Alliance. When you're talking about agency action that's unlawfully withheld in action, which is, I hear consumers of government services saying if the agency takes these various internal steps, it won't be able to fulfill its statutory mandate, and that will injure us. They need to come forward and say, here are the discrete agency actions that the agency is obligated by law with no discretion to take, and if they shut down, they will fail to take and injure us in the following brave and irreparable fashion. And they didn't do that. I also, I just have two others that I would love your views on. I did not take the government and its briefing to be substantially disputing paragraph five, which requires that to the extent that there are employees that need to do the statutorily required work, that the agency needs to provide them with the means to do that work, either in office or remotely. And I know you quibble with the reference to a specific software program. Personally, I don't find that persuasive because the court said this existing program or something like it. So, but the general notion, and I know you object to the prevention of rifts or stop work, but assuming that somebody would keep working, I did not take you and your briefing to be objecting to the notion that the people who are still working would need the tools to do this. So articulated, the government does not have a problem with that, enabling employees to perform their statutorily required work. And I don't think we have a huge problem with number five, but I do think it does go beyond what's necessary. For example, and this is also goes to the last part of item four, where defendants are prohibited from putting employees on administrative leave, sometimes, in fact, often when employees put on administrative leave, the employee may be cut off from access to the agency systems. And it appears that under five, that's something that the agency would be forbidden from doing. But the key parts of the injunction that we are really focused on and that are truly problematic for the agency going forward are items two, three, four, and seven. So just to clarify, on six, maintaining a consumer hotline, you didn't mention that in your opening, but that seems to be something that the agency has accepted is not only required by law, but quite explicitly. That's correct. So that one, again, falls in the bucket of you're subjecting us to judicial superintendents of compliance with the law without any adjudication that there has been a violation that injured the plaintiffs in any concrete, grave, irreparable fashion. But that's another one where I don't think it's going to require the agency to do much, if anything, beyond what the law already requires. Mr. McArthur, so I just want to be clear, in part, about what you're arguing. So your main concern is the matchup between the injunction and the alleged legal violation, which is the shutting down of the agency. Is the government also making an argument that the particular harm to these plaintiffs is not being addressed by this injunction? Because the harms here are, I mean, broadly speaking, something like loss of employment, loss of union revenue, I guess loss of CFPB services in some instances, and loss of contracts. But almost all of those can be repaired with damages. So is the government also making that argument that the harm to these plaintiffs is not really being addressed necessarily by this injunction? Yes, Judge Rowe, we are absolutely— A bit murky in the briefing. It is a bit murky, but I think there are two parts, at least, of the analysis that that goes to. One part is that first principle I laid out, the tailoring. The tailoring principle requires the injunction to be tailored both to the violation and to the harms. So you're arguing both. The tailoring is problematic as to both the harms and the legal violation. That's correct. And the other place where I think this enters the analysis is in the balancing of the equities, because I think the balancing of the equities here sharply favors the government, given the serious harms to Article II executive branch prerogatives on one side of the scales and on the other side of the scales. No real grave or irreparable harm that I can discern. They're both important principles. I didn't get the second one out of your stay brief. So I think you can see the second one— having been tailoring to the assumed legal violation of shutting down the agency. I think we did cite authority in our motion for the proposition that equitable relief has to be tailored to the harms. I am not sure that I see—I mean, again, of course, those are important principles, but some of the plaintiffs are organizations that represent consumers. And it seems to me that the plaintiff's principal argument here is that this is an agency that is charged with examining financial institutions, with enforcement of—what is it?— 18 different statutes that need to be spread among seven other agencies. And these are longstanding protections for the public against fraud, against unfair practices, against things like hidden fees, mortgage charges that are accelerated after a consumer is bound to the mortgage, things like that. And so the harms that are thought to be prevented are that the agency would not do the work that Congress set it up to do. And these plaintiffs, in your view, lack standing to raise those injuries? I think there may be some standing issues. We haven't briefed that here. We haven't briefed that at this stage, and I'm not prepared to talk about that in detail. But you could look, for example, at the Supreme Court's recent decision in the California case on Friday, where there was a very similar claim of consumers of agency services brought a claim seeking reinstatement of probationary employees that had been terminated, citing Clapper. The Supreme Court said those plaintiffs didn't have standing. I think we are going to run into some of those same problems here. You're not asking us today. Not today. But as I listened to that description, the words that came into my mind are programmatic lawsuit. That's what this is. This is the very definition of a programmatic lawsuit that's seeking judicial supervision of how the executive branch executes the law on a day-to-day basis. They brought this programmatic lawsuit. They persuaded the district court to enter an overbroad programmatic injunction, and it should be stayed because it seriously impinges on Article II prerogatives. I would like to emphasize that what we're talking about here is a major presidential policy initiative of this administration, one that President Trump ran on and was elected by the American people to implement, and that is to significantly streamline and reform the federal workforce. The president ran on and announced that his intent was to shut down CFPB, and I take it that you are disavowing that that is the plan. We are absolutely disavowing that that is the plan. I just want one qualification on the characterization of the president's statement. He said that was his goal in a colloquy with the press, and that's a goal that he is perfectly entitled to have- With Congress. ... and to express to the American people with Congress. He never said that was a goal that he was going to try to achieve without legislation. So this is a follow-up from Judge Totsis' question. So far, as I read the record of the two days of hearings and the arguments and the preliminary injunction opinion, the district judge here is entering a preliminary injunction as she believed was necessary to prevent a total shutdown of the Bureau, and I take it that you're not seriously contesting that, at least in this posture, that that finding, if you will, finding. So what you're looking for, and I understand it, is a tailoring of some of the provisions, at a minimum, a tailoring- At a minimum. ... and you may have more wholesale arguments that you want to make, but the difficulty that I have is when the proceedings were going on in the district court, when the district judge asked the government, well, what's your understanding of what the statutorily required duties are? And she wasn't getting an explanation of that. And so it really left her unable to credit that the government really had a plan not to shut down the agency. It seemed like the plan that it came in with was shut down the agency and then legally realize, well, we don't have a case. We can't defend, at least not before this judge, we can't defend on that ground, so we need to take a more nuanced position. But the support for that, I don't see in the record. So as an appellate judge, how could I, in the first instance, help you get a more tailored injunction? Wouldn't, for you, the preferable course be for us to give some guidance and send it back to the district court for a limited time to take evidence on those issues? So I don't think there's a need for any further evidence here. I think the plaintiffs had a chance to meet their burden and they didn't meet it. And I think it was not a fair inference of the district court to draw because counsel couldn't lay out all of the statutory or any of the statutorily required functions, but that means there's no intent on behalf of the agency to comply with the law. I think that is something that's conceptually easy to understand, but you can't just spell it out. It's something that has to be worked out in practice on a day-to-day basis. And that is for the executive branch to do, to figure out, okay, what are the statutorily required functions here? And is any particular task or any particular employee's work or any particular contract necessary to enable the agency to fulfill those statutory obligations? That is the heartland of agency administration that is vested by the Constitution in the executive branch and is not subject to judicial supervision on pain of contempt under an injunction. Just to be fair to the district judge who, like all of you, was operating on a very pressed timeline, she repeatedly made clear, repeatedly throughout the proceedings and in her order that she recognizes the government's legitimate policy discretion, its ability to refocus the agency's work to accord with its own priorities, including trimming discretionary programs. And she explained that the preliminary injunction is not directed at how vigorously the CFPB will enforce particular provisions within the statute, whether agency resources should be allocated to facilitate more robust supervision of non-traditional, non-depository lenders as opposed to more active monitoring of larger depository banking institutions, but just a stopgap to prevent complete elimination of the agency. So she's viewing the task before her, at least at the early stage. What do I need to do to make sure that when we get into the weeds, there will still be reversible or, you know, contracts if needed that won't have to go through a whole new procurement process? Agencies with training that we won't have to go through an entirely new hiring process. I read her to be absolutely agreeing with what you're saying about the executive's prerogatives. But at the early stage, A, lacking confidence that the government really had figured out how it would implement a plan to run the agency along new priorities. And that she wasn't in a position to, you know, make the more nuanced cut. Tell me what you disagree with about that, not on the record and in the posture with the briefing that you have. So I do recognize that the district court acknowledged those principles in the court's opinion, but they didn't get translated into the injunction. The injunction that was entered is inconsistent with those principles because it goes far beyond anything that's needed to keep the agency open and keep it fulfilling its statutory obligations. And the court, in all of the hundred plus pages of opinion, never explained why these various measures are necessary to keep the agency open and fulfilling minimum statutory obligations. Never explained why you have to reinstate every probationary and term employee that was fired. There was no finding made that in the absence of those employees, the agency would shut down and be unable to fulfill any statutory function. Same thing as to the contract. The injunction essentially seeks to restore the pre-February 10th CFPB to its full function. That is correct. And I take that to be the district court's understanding of what it means to maintain the status quo here, which is to take the agency back to the form in which it existed in the prior administration. I think that is a fundamental misconception of what a district court is supposed to be doing on a preliminary injunction to maintain the status quo. To maintain the status quo is to prevent discrete actions that have been identified and found to be likely unlawful from causing grave and irreparable harm to the plaintiffs. And that's the burden that they failed to meet here. It never came forward and said, if you shut down, here are the discrete things that the agency will be unable to do, that it is required by law to do with no discretion, and here's our grave and irreparable harm from that. Now craft an injunction around that. Instead, we've got this vastly overbroad injunction that requires us to reinstate every employee that had been fired, to reinstate every contract that prohibits the agency from terminating any employee except for cause, that prohibits the agency from terminating any contract, way beyond what was needed in order to redress the harms that had been demonstrated and the likely violations that had been found. So let's talk about employees, just to drill down a little bit. Do you have any idea how many employees the agency has? So I was told that in the prior administration, it had been running at about 1,700 employees. That's what I had guessed. So let me tell you how I'm thinking about this, and then I'll ask you for help, which is a RIF of every agency employee would obviously cause a shutdown and disable the agency from performing statutory functions, and on the assumptions that I mentioned at the beginning that you're not contesting at this stage of the case, like, would seem to be enjoinable. If that's what the court had enjoined. So that's fine. Right. On the other hand, the district court says no RIFs at all, and one can imagine an agency doing lots of RIFs that are perfectly consistent with meeting statutory obligations, and that's an overbreadth problem, and it's a Article III, Article II friction. Okay. But here's where I'm struggling a little bit, which is, you know, you laid off, I think, something like 200, you want a RIF 1,200, that leaves 300. Like, how do I know whether 300 employees can satisfy, can meet the statutory obligations, and how do we police that through, you know, on the stay motion with what's before us? I don't see there's any way that a court could put itself in the position of trying to decide how many agency employees are necessary for the agency to fulfill its statutory functions. The 1,200 number, I think is... Okay. But then how do we manage, like, you know, district court has this concern about shutting down the agency, and on the facts which you assume for purposes of the stay, that was a legitimate concern. But the concern wasn't translated into an order that was tailored to that concern. What would the tailor? I mean, at least as a rough cut at it, the court could have said something like, you know, you can't fire so many employees that the agency would be unable to fulfill its statutory functions. I think that's tough, because that's vague, and as I say, I'm just not sure there's any manageable standard that could exist for that. Well, so I have a question that gets to the elephant in the room, which is the missing definition of statutorily required function. And I have to say I'm a little bit frustrated with the briefing on both sides and with the record from the district court on this point. There's a focus, understandably, on specific statutory requirements. You need this ombudsman. You need this office. You need this website. You need this capability to take consumer complaints and interact with them. But as I understand this agency, it is the agency that is supposed to carry out major programs. It's supposed to carry out, you know, the Fair Credit Billing Act, the Electronic Fund Transfer Act, the Homeowners Protection Act, the Gramm-Leach-Liley Act, Real Estate Settlement Procedures Act, truth in lending, truth in saving. And the question, in addition to the specified, you know, you need this bureau and you need this function, the question that I have is, is it your understanding that if the government had no programs for enforcing any of these fundamental obligations about truth in lending, that that would be up to the discretion of the executive to take those to zero? Taking it to zero, I think likely not. Likely not. Likely not. But trying to enforce any level of activity, enforcement activity, supervision activity, I think that is absolutely off limits for the court. But to your broader question, and I know I'm going to sound like a broken record here, but the district court- It's up to the executive- No, no, that's not where I was going with this one, actually. The district court does not have a roving mandate to ensure that the CFPB is fulfilling all of its statutory obligations. The problem that exists here lies at the feet of the plaintiffs, because the district court's limited role here is to identify discrete violations leading to harms to these plaintiffs. And it's their burden to come forward and connect those dots, and they never did. That may be- Oh, no, but then you're smuggling Lujan Juan Suga into the stay argument. I think the principles from Lujan and Southern Utah Wilderness Alliance do very much inform what a court is doing at the injunction stage, because it talks about courts lacking the power to superintend how agencies work out compliance with broad statutory mandates. Actually, what was before the district judge was a plan that appeared to be a total abdication of these statutory duties. I don't think the government ever acknowledged or mentioned how it planned to pursue any of its enforcement or supervision duties or regulatory duties under any of those statutes. And if the district court is making a finding that an executive that intended to shut down the agency had not developed a plan B, to my mind, on an abuse of discretion standard on review and on this record, it would be perilous for us to decide without more facts how to tailor this injunction. Now, I'm not questioning that there may indeed be ways to tailor it, but I'm questioning how you are confident that on a stay, we can do it. So, Judge Fillard, to your preface to the question, I think it is not a fair burden to put on an agency to come into court and spell out, here is how we intend to execute all of our statutory responsibilities. I didn't ask. I didn't say that that was what was needed. I said there was no suggestion. There was no acknowledgement by the government lawyers in the district court of the nature of the large bulk of the agency's statutory responsibility. I think there was absolutely acknowledgement on the part of the government and the part of the government's witnesses that there are certain statutory obligations and that the agency is committed to fulfilling them. And that, too, is a matter of record. Can you point me to the, because, you know, I'm having trouble recalling those references. Can you point me to anything that you think is sort of on the way to acknowledging those responsibilities? So, I think you can look at Mr. Martinez's declaration, where he said in the fact-finding hearing, where a lot of what Mr. Martinez said was put under rather scathing cross-examination, there were some retreats from what he said in the declaration. I don't think there was ever any retreat from the key point in his declaration, which I think he reiterated in his testimony, that, you know, a few weeks into this process, I think everyone acknowledges that the first few weeks of February were a pretty turbulent time for the agency. But he said that by the time that he had filed his initial declaration on February 24th, that the agency's new leadership had started to gain control of the agency and that it was his understanding that the misimpression he and others had had earlier, that there was some intent to shut down the agency, was not the view of the agency leadership. And I think if you look at the record, you will see multiple occasions where Mr. Paoletta and he is the chief legal officer of the CFPB, who Mr. Martinez testified was functionally running the agency. You see him taking multiple actions to dispel that impression, making clear that employees need to be performing their statutory functions, don't have to ask permission, looking over contracts one by one to figure out, is this one that was terminated one that we need for fulfillment of our statutory functions? And the district court just simply swept that all aside and said that window dressing- That's a question that I asked because I read the record and I know that there were places where Martinez and government counsel said the plan is not to shut down the agency, the plan is to do the agency's statutorily required functions. What I was asking, I think there's a disconnect or the district judge was unpersuaded by those efforts of reassurance. And I'm not prepared to say unfairly so on this record, because the government maybe thought that putting up the consumer complaint function and making sure that the individuals who were named in the statute had individual positions, had somebody filling them. But I never saw anything in the record where the government explained, we're going to do enforcement, of course, but we're going to focus more on, let's say, elders than on some other priority that was different from what the prior administration did. So I think there's a lot of doubt. And really, I mean, you heard me, I put my cards on the table from the beginning. Why wouldn't the really only appropriate course be for us with some guidance to send this back to the district court, who has expressed again and again, her interest in hearing from the government, what's excess and what are the statutorily required duties? So we already presented to the district court, I think, the core of the relief that we're asking from this court, which is to, at a minimum, stay provisions two, three, four, and seven. And I think, as Judge Katsas and I discussed earlier, you could carve out that first clause of four, with which we don't have a serious problem. We presented that to the district court in our renewed request for a stay below. So even holding the contract, halting the contract, but not finally terminating them, even that, in your view, causes the government irreparable harm. It absolutely does. What is the irreparable harm from that? Not paying any money, not having to have the contractors take action. But for example, in a contract where an expert has information that the agency needs going forward, or where it's a data provision contract, that can be finally terminated before the government is confident that it's not taking down it statutorily? So the only thing that the court permitted us to do with regard to the contracts is, based on an individualized assessment, to stop the work or services. It does not follow from that, that the government can always stop payment. In some cases, yes. But there may be contracts that have minimum service requirements. There may be incidental fees, like paying flat fees, or paying a project manager. But as long as that contract is in force, the government has to keep sending money out the door that it can never recover. And again, the Supreme Court just recently recognized, in the California case, that money that the government is being forced to spend by an injunction that it can never get back is irreparable harm to the government that supports a stay. So MacArthur, if we were to send this back to the district court, would the government argue that this whole injunction is moot? Because the district court's reason for the injunction is that the government is shutting down the bureau. And it seems that more recent evidence is that the government is not shutting down the CFPB. Would that just moot the entire enterprise of this structural injunction? I mean, if we were able to persuade the district court of that, yes. The government absolutely is not shutting down the bureau. We stand by what we said. That's the premise of the injunction. It is. It's not any particular harm to the plaintiffs. The premise of the injunction is that there is a shutdown of the CFPB. And the government has now said in many different filings that it is not shutting down the CFPB. So the whole basis for the injunction seems to have evaporated. I agree with you, Judge Rao. I am not confident there's anything that we can say or do to persuade this district court that that is the case. But I do want to assure this court that we stand by the representation that was made, that was quoted in the administrative stay order, that the bureau will remain open and perform its legally required functions. And I am making that representation not just on behalf of myself or the Department of Justice. I have been specifically authorized by the acting director of the bureau to make that representation to the court. And the acting director reports to the president. That is correct. Authorized. I've been in your seat. I know the issue about getting clearance up the chain. And if you don't know, you don't know. But are you authorized to stay on behalf of the entire executive branch as an officer of the court that the agency will remain running? I have not obtained authorization or sought authorization from the president on this issue. But I think if you want to look at what the president's position on this is, you should look at the president's official acts. February 11th, the president nominated Jonathan McKernan to be the director of the bureau. And Mr. McKernan recently testified before the Senate and confirmed that if he is confirmed that on his watch, the bureau will continue to enforce the consumer protection laws and will take all steps necessary to comply with the legally required functions of the bureau. So, back to the employees for a second. Just suppose at this stage, I think we have to respect a prohibition on RIFs that would endanger the agency, but that we think it's overbroad and want to make sure you have normal agency discretion to do RIFs that would not. Help me write that statement. What would you have us say to implement that? I think, I mean, it's very difficult to craft, but I think the court. That's why I'm asking. I think the court would have the authority and could, for example, condition the grant of the stay on the government not implementing any RIF that would leave the agency unable to perform its statutory functions. And then if the plaintiffs thought that the RIF that was proposed or being implemented violated that condition, they could come back to this court and they could ask the court to evaluate that and if necessary, lift the stay. What type of relief? Why in the face of southern Utah wilderness? I think it is in substantial tension with that. And that's why I. It just puts us in judicial receivership over the employment decisions of the executive branch. I think it would to a certain extent, but I think there is a key distinction between what I was just proposing and what we're living with right now. What I was talking about is a condition of this court stay, not an affirmative obligation that would be imposed on the government upon pain of contempt, but something that would exist as acting on the proceeding. You can look at the Supreme Court's decision in Trump versus Iraq in 2017. A stay is something that acts on the proceeding, not in personam. And so, as I said, if the plaintiffs thought there had been a violation of that, the remedy is not going to become and try to hold the government in contempt in the district court. It's going to be to come back to this court and say, we think the government's not complying with that condition. They've proposed a riff that's going to so gut the agency that it can't perform its statutory functions. You should vacate. We judge that point of special master to take evidence. I think you would judge that with extraordinarily substantial deference to the executive branch's judgment that the remaining employees will be able to fulfill the statutory function. I, our circuit has case law that it is the government's responsibility in a case in which it objects to the breadth of relief to propose narrower lawful relief. Once the district court has determined that the original plan was unlawful, that's exactly what happened here. The government says, no, can't shut down. Tell me what relief short of the injunction that she put together, what relief are you asking for? I saw no form of order from the government at any stage because you were still fighting the, either we're not shutting down or we have full discretion or article two or what? Another fight. That's sort of his memorial. I don't see any order that's narrower than this preliminary injunction that was ever proposed by the government. Of course, we didn't think that any injunction was appropriate at all. But part of this is simply a practical problem, right? Because we don't know what violation the court is going to find or what the scope of the release the court is going to award is until it's done. And when it was done here, the court didn't grant our request to stay in the relief order. The relief was made effective immediately. And we had a compliance report due in seven days. And I'll tell you, when a district court enters an order like this, after writing an opinion like this, it is time to appeal. And we came to this court as quickly as we could because there was no time to lose. We wanted to give you the maximum amount of time to evaluate our emergency request for relief before that compliance report was due in seven days. And there's no substitute date for the compliance report at this point? That has been stayed.  The district court, in response to our renewal request for a stay, stayed the compliance reporting deadline until this court resolves our stay motion in this court. So do you, the way I understand the posture in part is that the district court found an intent to shut down the agency and that the plan continued to be to shut down the agency, perhaps in stages rather than one shutdown order. And various representatives of the government have said otherwise. And I take it that we would assess those representations under a voluntary cessation standard. Is that right? If there were a question of mootness on the table, that might be the way that you would assess that, yes. So the notion that parts or all of the preliminary injunction are moot would have to meet that? I do think you'd have to have that analysis, correct? You think there would have to be a voluntary cessation analysis against whether the government is following the law, which it's required to do? I think it's standard, so the injunction could just remain in place because the government said it was following the law? I think that's too broad, Judge Rauh. But I think if there were determination that the government... Then the injunction could be in place indefinitely. Well, we definitely don't want the injunction to be in place indefinitely. I mean, if it's a matter of voluntary cessation, that seems like a remarkable... Well, I think we're talking about two different things here. Voluntary cessation would go, I think, to whether the claim itself is moot. I don't think that's the inquiry that you do when you're looking at whether there's a need for an injunction. I think looking at that latter question, even if there's some possibility that it could be repeated, that's not enough to carry the burden to maintain the extraordinary injunction that the district court entered. Let me ask you a sort of in-between question. So we've talked about how the government should not be required to explain and justify exactly how it would exercise its enforcement duties or its supervision of financial services entities. Is there anything... Would it be inappropriate for the court to ask the government how many employees the government believes are required to support the statutorily required duties of the bureau? I think that's not a fair question to put to an agency. They may not know the answer. I mean, some of this has to be worked out day-to-day in practice. And if the agency... And I do think the record does support, and this is consistent with the president's policy initiative, that they think this agency is too large and that it should be substantially downsized and really cut back to its core minimum statutory functions. And if in that process they go too far and they disable the agency from performing some mandatory statutory function, the answer is that it's for a plaintiff withstanding to come in the door and say, that was a discreet, mandatory action the bureau was required to take. They failed to take it. I was injured in the following way. Order them to perform the action that was unlawfully withheld. That's how that gets worked out. It doesn't get worked out like on day one, when the acting director takes the reins of the agency and figures out exactly how the statutory responsibilities are to be implemented. Can I ask a scope question with regard to the contracts? Same framing in my plan. I don't want to disturb at this stage a prohibition on terminating all contracts, which would be disabling, but I want to make sure you have appropriate discretion. Is it the line between stop work orders and full termination, or is it something else? What line would you have us draw there? I think the line would be that the line would be disabling the agency from performing its statutory functions. And again, there's no particular function that has to be performed by a contractor. It could be performed by agency staff instead. And that's another key flaw. The district court never found that these contracts were necessary. And that's not even an inquiry the court can undertake. Again, if there's a discreet failure to act, the court could order the agency to take the action that was unlawfully withheld. But it could not tell the agency how to do that, and certainly not say you must retain a contractor to do that. There are no further questions? Thank you, Mr. MacArthur. And we'll hear now for affilees from Ms. Bennett. Good morning. May it please the court, Jennifer Bennett on behalf of the affilees. And some of what we just heard, I think, shows that this is an extraordinary case. The district court found, based primarily on hundreds of the CFPB's own documents and the testimony of its own witness, that the defendants had tried to dismantle the agency, and that if given the opportunity, they were ready and willing and wanted to do so again. As Mr. Martinez, the chief operating officer of the agency, and again, the defendant's own and sole witness testified, the agency would be wiped out in 30 days. They canceled the agency's contracts. They ordered its employees to stop work. They placed virtually the entire agency on administrative leave. And they were in the process, admittedly, of firing everyone when the preliminary injunction motion was filed. The only thing that stopped the defendants from fully shutting down the agency was the district court's intervention. And the defendants don't assert that any of this is legal. And that's critical. At this stage, the defendants are not disputing that the actions that the district court found to have taken place were unlawful. And they don't even try to show that the court's findings that these actions did take place were clearly erroneous. And the defendants, as we just heard, aren't making any argument at this stage that the district court could not enter some injunction to preserve the status quo and to prevent the defendants from making it impossible for the court to enter relief at the end. So the defendant's sole argument at this stage is that the district court abused its discretion in defining the scope of the injunction. And for that reason, the defendants say this court in an emergency stay posture should stay the whole thing pending appeal, or at the very least, it should stay the vast majority of its terms wholesale. Can I ask about scope? Sure. So you have, to me, at this stage, a pretty powerful case that it would be, you know, the district court could deal with a situation involving the termination of all employees and cancellation of every contract. Okay, but the injunction says don't terminate any employee except for cause and don't terminate any contract. Just a huge gap, chasm between what the, that aspect of the injunction and what the district court was quite rightly concerned about. Sure. So I understand that concern, and I want to take the two provisions in turn, maybe in reverse order. Sure. The digital on the contract provision, you know, what the district court said is you can stop work, stop payment on any contract you like. And I heard the defendants just say that they can't stop payment. The only evidence in the record is that when they stopped work on all of the contracts of the agency, they stopped payment on those contracts. The only evidence before the court and in the record, and I, you know, as I understand it from the contracting officers in the Bureau, this is correct, is that when you stop work, you stop payment. So all the district court did is say you can stop work on any contract you want. You can stop paying on any contract you want. The only thing you cannot do is take the final step to make that irretrievable. Okay, so let's talk about termination. Sure. I mean, terminating all the contracts sounds bad, but terminating any contract sounds like something any agency would do in the ordinary course. Like, you make contracts, you end contracts. That's just ordinary administration. Sure. So two answers that the first is, you know, the law is quite clear going back to Lowe's and the Supreme Court has also implied the same law when the government is a defendant. When a defendant is using what would otherwise be lawful behavior to effectuate an unlawful, in this case, unconstitutional plan and action, the court is permitted to enjoin what might otherwise be ordinary lawful behavior if necessary to ensure complete relief at the end and to preserve the status quo. And that's exactly what's going on here. You know, the district court found and the CFPB's own records were that they wholesale terminated virtually every contract. And that includes things like the contract to maintain the database. It's not just people. It's the contract to maintain the database for consumer response, which is statutorily required. Every contract that supervision required. So in order to prevent termination of a number of contracts that would be disabled, presumably a pretty high number, the court can enjoin the termination of any contract. And that is the most tailored option to achieve the objective. So the court, I want to be clear, the court didn't enjoin the termination of any contract in any ordinary sentence. The court gave and I want to finalize the termination of any contract. Right. Well, so I want to make clear that when we ordinarily say terminate a contract, what we mean is nobody does work under that contract and we don't pay for it. That provision allows the defendants to do that. Any contract that they think is unnecessary to the statutory functions, that's the stop work orders that they sent out. Any contract that they think is unnecessary, the district court says, sure, have it stop work and stop paying for it. The only thing the district court prohibited is making that irrevocable so that we don't have to come back and forth to the court every time something is terminated to fight about at that time, whether it was or was not necessary to statutory functions. What the district court did is give as much discretion to the defendants as the court possibly could by saying, do whatever you want. There's just a final step that makes it irrevocable. Just don't take that final step. Now, if that is acceptable, and I should let you follow up, sorry. No, I just, maybe I don't understand the day to day contract administration. I thought she drew the line between stop work orders, which are fine, and termination, which is not. Termination of any contract, which is not. That's correct, but I think we're having maybe a terminology issue. So a stop work order, and you can see this by the stop work orders that are in the record that they issued when they issued them to every contractor, is an order that says don't do any more work, and it also says we're not going to pay you anymore. So it is essentially what I think ordinary people would think of as termination of a  But in government contracts, there's an additional step beyond we're going to not use this anymore. We're not going to pay you, and you're not going to do any work. There's an additional step that you have to take to fully finalize it so that it's irrevocable. And once it's irrevocable, then you have to redo the whole procurement process. And so the contract provision is quite narrow, and it just says don't take that final irrevocable step so that if we disagree at the end of the case, or if something is really very important in the interim, the court can grant relief. That's all that contract provision does. If they have an existing contract, they can go to the contractor and say stop all work, and this is not stopgap. We intend, we never want you to perform any more work, and when and if we're allowed to take that final step, we intend to. Yes, yes, and that's exactly what the agency has done, you know, through the pendency of this proceeding. Ms. Bennett, you've said that an injunction is permissible to allow district court to grant full relief to the plaintiff's harms at the end of the litigation. But how is this injunction tied to these plaintiff's harms, right, which largely include loss of employment or loss of contract, things like that? Why is maintaining the agency at the pre-February 10th level necessary to remedy these plaintiff's harms? So, I think a couple things on that. One is I don't think what the district court said is the agency has to be operating in the same way it operated before February 10th. I want, you know, the district court said very explicitly and intentionally in the preliminary injunction did not include any provision that would direct any of the policymaking officials at the Bureau to direct the Bureau's resources to any particular- A lot of these provisions are aimed, as you said, at keeping the status quo. Sure, operationally, and the reason that that matters is because what the district court found, and again, the defendants are not contesting this. I think it would be very difficult for them to, given that it was their witness who testified to this, what the district court found is that the actions that the defendants were taking, and these are the actions that are listed in the preliminary injunction, were to shut down the agency. And there's no- But now they're not shutting down the agency. Well, so I think that's a, you know, they have made an assertion before this court that they are not shutting down the agency, and I want to address that because I think that's important- Well, how is even shutting down the agency connected to the harms of the plaintiff, right? So, I mean, maybe shutting down the agency entirely, but keeping it open at some minimal level, why wouldn't that be sufficient? Well, so that's, you know, two questions. You know, shutting down the agency, I think, is, you know, Mr. Martinez, again, their own witness testified that that would be irreparable harm, and you can see that when the agency, you know, even in the few weeks that the agency was basically fully shut down. You know, for example, one of the plaintiffs is at the Virginia Poverty Law Center, which depends on the agency to be able to help consumers, and when the agency shut down, its consumer complaint division essentially shut down. It was taking in things into an automated database, which itself was already breaking down, wasn't doing anything to help consumers. So, you know, people facing imminent foreclosures did not get any help. Sixteen thousand complaints just went totally unanswered, and that division works hand-in-hand with the enforcement division and the supervision division to give relief to consumers. But those are specific harms that perhaps could be remedied, you know, in more specific lawsuits, right? But this is a lawsuit about, you know, the entire structural approach to how the agency should be run. Well, so two things I want to say about that. One is, you know, I think that question goes to likelihood of success. And it is not—the defendants at this stage have not made that argument before this court, and they have to make a strong showing on likelihood of success. And they've made no showing at all on this argument, which is why it's not briefed. You know, they've made no showing at all that they are likely to succeed on that argument on appeal. And so I think it's not in—you know, as this case comes to this panel, I don't think it's in the set of issues that's even before this panel. Which argument are you referring to? The argument—I see, Judge Rao, your argument is essentially is whether the preliminary injunction is necessary to remedy the harms of the plaintiffs. And the question about tailoring that the government has certainly made. That's right. And I—and their tailoring argument, I wouldn't—you know, if you look at their briefs, there is no explanation at all. They don't give any reticulated argument about that there's a tailoring problem to  And their only tailoring argument is, look, this injunction stops us from performing—from using tools we would otherwise want to use that are lawful. And so to go back, I think I—to go back to your question, Judge Katz, about termination, because I think that is the other place that they are—that the defendants are— Contract termination? Sorry, employee terminations. Ask you about that. Yeah, sure. So—so the district— And I put my cards on the table. I think lots of risks are perfectly ordinary and appropriate. There's, you know, no disagreement that the law allows agencies to conduct risks. I think that the reason the termination provision is—I don't think they're likely to succeed that this termination provision is broad—is overbroad, and I'll explain why. I also don't think that the defendants have made any showing of irreparable harm for keeping it in place just through the pendency of appeal. So on the first issue, you know, the defendants—the district court found, and this is, again, based on the testimony of the defendant's own chief operating officer, that not—that the agency was using risk to shut down the agency. It was doing it in stages. So it was not, you know, the—what the agency was doing was not laying off everybody in one fell swoop. It was laying off probationary employees, and then term employees, and then 1,200 employees, and then the rest. And so—so it was not that the agency—it was an all-or-nothing thing. And what the district court also found, again, based on the testimony of the agency's chief operating officer, is that this plan continued. And the only evidence before the district court is that the only reason the agency was trying to conduct risk was to shut down the agency, and there was no different plan. The agency never told the district court, and in fact, the defense counsel told the district court the reverse, that there is not a new lawful plan. There's nothing specific that we want to do that this provision is actually prohibiting us from doing. Well, Ms. Bennett, I mean, whose obligation is it to determine in the first instance what the statutory minimum are of an agency? I mean, why would the executive branch have to explain that to a district court? Well, so I'll note that— In detail, right? That's the argument. The argument is that the government has to detail what it thinks specifically is the I mean, how can that be something that is susceptible to judicial control? So two answers to that. One is we are not making an argument, and the district court did not base its ruling on an argument that the defendants had some burden to initially propose an injunction. It was our burden, of course, to satisfy the preliminary injunction factors and to propose relief that we believe was necessary to preserve the status quo and to prevent the shutting down of the agency during the litigation. And what the district court found is that this preliminary injunction was necessary. And then once that burden— Even the district court found it was necessary, as Judge Pillard also alluded to, was that the district court thought that the government hadn't said what the statutory minimum were. In the absence of some representation about what the statutory minimum required, that this injunction was appropriate. So that was a material part of the district court's reasoning. I think that might be— I can see reading the district court's opinion that way, but I actually think it was— So the plaintiffs, for example, filed a list of the statutory obligations that we thought that the agency was required to fulfill. And the defendants at the hearing refused to even comment on them. And they said, you cannot enter an injunction that just says fulfill statutory functions because we don't know what that means. And they said, even if you enter an injunction that has a list, we think that there will be too many fights before the district court about whether we fulfilled that to make that a manageable injunction. So the defendants are here proposing an injunction that they told the district court was unlawful to enter. And so given that, what the district court did is say, OK, what I need to do is I need to make sure that during the pendency of this case, that's it. Just while we're figuring out what the facts are, whether the— That could be a very long time, given the pace of litigation in our courts. Sure, and that's why— It needs to be two years into a president's term before he could direct how an agency should function and at what level. So I think that is a question for the merits panel to determine and also the tools about— there are tools for modification. The district court has expressly said, I am open for business. And so I think that's a question for the length of the injunction and whether an injunction of that length would cause irreparable harm to the defendants that outweighs the harm to the plaintiffs and the public interest. I think those are all questions for the merits panel. The question here is just, in the time that it takes to get to the merits panel, should—is there—has the defendant shown that there is sufficient irreparable harm when they haven't even identified anything, any specific action they want to take that is lawful that this injunction would prohibit? All they've said is, we want—hypothetically, it impinges on our Article II authority to have an injunction that hypothetically limits what we can do. But they told the district court the only risk plan we have in place is a plan that would lead to shutting down the agency and explicitly said, we have not come up with any other lawful plan. So this injunction in practice, the termination provision, does not enjoin anything that the defendant has said we want to do. I have a very specific question for you.  It's about the paragraph that says, the defendant shall not enforce the February—this is paragraph 4—shall not enforce the February 10, 2025 stop work order or require employees to take administrative leave in furtherance of that order, not reinstitute or seek to achieve the outcome of a work stop, etc. Is it your understanding that that is referring to a stoppage of all the employees in the agency or any telling of any subset of employees that they have to stop working? I think it's a prohibition on essentially the kind of stop work order that was issued before, which was an agency-wide mandate to stop doing work with no exception for statutorily required functions. It is very clearly—two points on that. One, it is directed at people, which is to say the agency can't say, you know, nobody at the agency should be working with no vehicle for people to do their statutorily required work. It does not say that the agency cannot direct what work those people should be doing or stop any particular set of work that the agency is doing. I think the district was very clear about that. I mean, I think this provision is clear, and I think the district was also very clear about that in the opinion. Another question is, you had said that the district judge said, you know, tailoring, fine, I'm open for business. I want to hear from you, but in ruling on whether the district court had jurisdiction to explicitly address a stay request from the government and answering in the affirmative that the district court believed it did have jurisdiction, it said it did not believe that it would have jurisdiction to modify the injunction going forward now that the case is in the court of appeals. Do you disagree with that? And if it has no authority pending the stay appeal to change anything, is that the best use of time, or should we revamp to the – it seems like everybody thinks that the district judge should have a crack at some kind of narrowing. But it just seems like it's going to be longer than necessary before she gets that chance. Or do you have a different view of the district court's ongoing jurisdiction while the stay motion is pending here? So, I do think the district court has ongoing jurisdiction. An injunction is different than – is not subject to the same ordinary rule, of course, that when something goes up on appeal, the district court loses jurisdiction, the federal rules, and we cited this in our response to the defendant's 28-J letter. The federal rules explicitly say that while an appeal is pending, the district court maintains jurisdiction to modify, vacate, add an injunction. And I don't – I did not find on at least short notice, I didn't see any case from this circuit addressing that rule, but there are cases in other circuits that explain that that is true, and there are cases from a number of district courts in this circuit saying that, and so the law is pretty clear, actually, that even while on appeal, the usual Griggs rule, district court loses jurisdiction, doesn't apply to the modification of injunctions. Go ahead. You referred a few minutes ago to a list of the statutory duties of the agency that the plaintiff's provided. Are you referring to the attachment to the Greer-Do declaration?  Yes, Your Honor. The statutory requirement for continuous operation of the CFPB. That's right. And just – I want to address a couple of things. Time permitting, one is this idea that the court can rest on the reassurances of counsel that if you say this injunction, or if you say it with the exception of telling us to do our statutory functions, that we will comply with the statutory functions. Those are exactly the same representations that the district court found to be untrue, and that they're same representations that were in fact disavowed by the defendant's own witness. Can you be more specific about that last point? Sure. So, I take these representations in the brief. The facts that are cited for that is, one, the Martinez's declaration, and specifically his assertion that, quote, our leadership is working or has worked to comply with statutory functions. And the transcript, if you look, and this is cited at the district court's opinion on page 93, it's the transcript of March 10th, pages 187 to 88. What Mr. Martinez testified is he knows now that that wasn't true when he said it, and the reason he said it is because agency leadership, Mark Paoletta, told him it was true, but now he knows it's not true. So, the main thing that the defendants are relying on for their assertion that the agency is now going to comply with statutory functions is this declaration, and this declaration was disavowed under oath by the person who made it. That he also said, in fact, I don't know whether the agency is complying with statutory functions. The other thing that the agency is relying on for this assertion are the emails that the district court found, and the agency has not challenged this finding, that were nothing more than window dressing. And I think you can see, if you look at the agency's own reply before this court, why it would be problematic to rely on those emails, especially while ignoring the district court's findings that those emails could not be relied upon. So, in the defendant's reply brief, it's page 11 and 12, they cite emails that they say show that statutorily required contracts have been unterminated. What Mr. Martinez testified, they tried to make the same argument in the district court, and what Mr. Martinez testified, this is on the March 10th transcript, page 170, rather 171, that, in fact, that was a misreading of the emails. What the government is doing is putting two emails together that don't actually go together. What actually was unterminated is a very small handful of technology contracts. That is the spreadsheet that was attached to the email they're citing. It was not all of the contracts that underlie the bureau's statutory functions. Can you give us a sense of what some of the contracts are? There are contracts that relate to enforcement. There are contracts that relate to supervision. What is the general nature of those, and how could they relate to the agency? How could a judge know when they relate to an agency's statutorily required duties? Sure. I think to give you some examples first, so, for example, the consumer response division identified five contracts that were necessary to its function that that division administered, all of which were canceled. Those included, for example, a contract to maintain the database that takes in complaints. Without that contract, the database quickly degrades and will not be able to take complaints anymore. Another one, and this, I think, will highlight the difficulty that the district court judge would have absent the defendant's help, is an antivirus contract. The defendant, in canceling all of the contracts, canceled an antivirus contract, which screened everything coming into that database for viruses, and particularly attachments. By canceling that contract, they rendered the database virtually nonfunctional. We asked in the district court over and over again, hey, we would be happy to propose something narrower to identify specific contracts, but to do that, we would need a list of the contracts, which we know exists, and the defendants refused to provide one. I think it's the First Circuit recently made clear, once we meet our burden that a preliminary injunction is necessary and show that this is the minimum necessary manageable injunction to prevent the harm and to preserve the status quo, the party opposing the injunction can't just say, well, it's an up or down vote. You either enter this or not, and then try later to say, oh, actually, you should narrow it in this way, or you should have used this information.  GONZALES-DAYLOR. Ms. Bennett, can I ask you, if on February 10th, agency leadership had decided to just say something other than what they said, they took the same actions, but they didn't say they were shutting down the agency. They just decided to stop work on a number of matters while they figured out how to go forward with, you know, what the president had directed them to do. Would that be amenable to an injunction?  So, if what the agency, in fact, did is just stop work on matters temporarily, I think I don't know that that would be amenable to injunction. But what the district court found and what the defendants have not challenged is that is not what the agency did. In fact, what the agency did is-  I'm asking you counter, arguably, a counterfactual.  Sure.  They don't say they're shutting down the agency, but they take more or less the same actions for a couple of weeks. Would there be any claim to get into district court for an injunction of this nature?  I think if by the same actions, what you mean is stop all work, put everybody on administrative leave pending the implementation of a plan to fire everyone and to transfer any remaining HR functions and data to, you know, preservation functions to some other agency. I think absolutely. I don't think the words, we are shutting down the agency, is what matters here. I think what matters here is that the decision was- So, what would be the challenge to that action? If you were to come to court and they haven't said we're shutting down the agency, what would you be challenging? What would plaintiffs here be able to challenge? I think the challenge would still be to the decision to shut down the agency. The agency doesn't need to say we're shutting down, but if it has decided to take actions that would in fact- Could general employees challenge their temporary being put on administrative leave? Would that be amenable to a lawsuit? I think- Would the union have standing? Would they be injured by a temporary, you know, putting people on administrative leave? Would these plaintiffs be able to challenge the contracts being unwound one by one? I want to be really clear that I think those are all hard questions and they're not presented by this case precisely because what the district court found and what the defendant's own testimony showed is that it was not contracts being unwound one by one. In fact, there's documents that show they canceled wholesale all of the contracts. It is not- Do we have standing to challenge the cancellation of contracts by a federal agency? I think if a federal agency canceled all of their contracts, meaning that the agency could not perform its statutorily required functions that harmed, you know, the plaintiffs, for example, if the wholesale cancellation of contracts prevented consumers from getting the release that they otherwise needed, that would certainly be challengeable. But I want to know that- They would have to show that, right? They would have to show that the cancellation of the contract prevented them from getting something that they were required to receive under statute. I think that's right. And I want to just note we're getting- That's a very specific showing. So we're- I think that's right. I think it's very far afield both from this court, is before this court right now, which is whether the defendants are entitled and have met their burden to prove that an extraordinary measure, a stay pending just the resolution of this appeal, is warranted. And also, from the facts that the district court found, what the district court found, which they are not- which the defendants are not disputing, at least at this stage, because it would be very difficult to dispute, is not that there was contract cancellation separate from a temporary pause on work, separate from something else. What the district court found, and is well supported by the record, is that the agency was in the midst of a decision to shut down. And each of these actions were the actions that the agency took to shut it down. And all the district court's preliminary injunction does is mirror the agency's actions that it in fact took to admittedly shut down the agency. Let me ask you about the employees. You had a useful colloquy with Judge Katsas about the contracts. The employment situation feels a little harder. More employees and the way that the preliminary injunction is written, it requires reinstatement of probationary and term employees. And I understand that at least one, perhaps more, probationary or term employees who are not usually protected by any need for a reason before they're fired, that at least one of them was the person in a statutorily defined role. So there's a little bit of a hook there, maybe, but one typically would assume that the government would put a different person in to cover that job. And so what conceivable ground would there be in the district court's concern or finding that there was a plan to shut down the agency to not allow at least the termination of probationary and term employees? So I think there was a number. So I want to separate reinstatement from risk, and I hear the reinstatement question. There was a bunch of evidence in the record that the defendants wholesale terminated everyone, and by doing so, that had an impact on statutorily required functions. I wanted to get there, but I wanted to separately ask about the probationary and term employees and why that isn't a kind of separate question, whether they could just be let go at the outset. So it might be a separate question. The defendants have not made that argument, actually, at all anywhere, as far as I am aware, and certainly not before this court. The claim in this case is not that the way that they were let go violated the statutes governing how you can terminate probationary and term employees, although I do believe that, in fact, it did that. But that's not the claim in this case. It's not really the claim in this case is that that was one step in the defendant's plan to shut down the agency. All right. So stepping back and looking more broadly, I guess there are these three provisions, two, three, and four, that deal with people working. And three, for example, says the defendants shall not terminate any CFPB employee except for cause related to individual employee's performance or conduct, and defendants shall not issue any notice of reduction in force to any CFPB employee. And what I take that, and I know there's a difference between a termination, a reduction in force, and potentially what I take to be more a term of art in this litigation, a stop work order. But my question is, what can the government do in shifting its priorities in seeking to streamline the agency? I take it that neither the district judge nor your clients dispute that in ordinary circumstances, it would be nothing whatsoever unlawful about trimming the workforce and redirecting what people are doing. And so why no ability even to have people unadministratively not working? Why do they need to keep paying a lot of people that they, under their plan B, may not at all need? Yeah. So the answer lies in what the action in the plan to shut down the agency was and continue to be, which is we, the only reason we are going to use reductions in force is to shut down the agency. I do think that if the defendants had, once that is the evidence, I think just for the pendency of the litigation, the district court can say, look, the only evidence I have, the only reason you're going to conduct this is to shut down the agency and you still plan to do this. And I think it's worth thinking about what alternatives the district court had. One, this provision comes from an order that the defendants agreed to. And so when the defendants sat down to draft a provision that the defendants thought would be manageable and prevent harm through the course of at least the preliminary injunction proceedings, this is what the defendants came up with. And the reason for, in conjunction with the plaintiff- They'll never agree to anything again. If they agree to that as a temporary measure to move forward without everything blowing up. Right. So I want to be really clear. The argument is not that anything the defendants agree to or the government agrees to for a small period of time, therefore prohibits them from saying, you know, from getting a stay or from saying later, you know, we, you know, this is going to cause us harm if it is prolonged. I think in the context of this litigation, where the only thing the defendants are challenging is the scope of the provision. And when the defendants had to sit down and work out a provision with the scope, this is what the defendants agreed to. And the defendants have not been able to offer anything else. And I think, you know, I will concede it as hard as why a district court judge has discretion to draft the preliminary injunction that the district court thinks is manageable and therefore necessary to preserve the status quo. And I think it's worth thinking about what the other options are. The other option that's been presented to you is, say, don't terminate anyone that's necessary to our statutory functions. That is the only thing that the defendants told the district court below they could not enter. And that they said, we would not know what that means. We could not comply with that. And what that would have is a series of us coming back to this court over and over and over again. We'd never get to the merits because that's not a manageable injunction. That's what they said. You could imagine another one that based it on percentage or numbers. But, of course, we know from the student loan ombudsman, from other special offices, that it is not a percentage of employees. There are particular people that are needed or particular roles that are needed. And a reduction in force, at least as the agency was considering it, is taking out roles. It's not taking out people. It's cutting out roles. And there was no way for the district court to be able to say, don't cut 25%, because then you might cut the role of the student loan ombudsman or the entire consumer response division. And so that is not a manageable, that is not something that would work. The defendant, the court could have entered no prohibition on termination. And then as the district court found, the brief notices that are ready to go would be sent out and the agency would be shut down within 30 days. So is there any narrowing whatsoever that plaintiffs are amenable to or even amenable to working toward with the government? Absolutely. So I want to be really clear. Our position is not that we would be unwilling to narrow this. Our position is, as far as we could tell and the district court could tell, this is the only provision that would be able to preserve the status quo and be manageable. At that point, if the defendants who have more information come forward and say, actually, the thing we want, the thing that we think would still be administrable and permissible would be this thing, I think absolutely we would be amenable to talking about that and to either before the district court or independently conferring about that. But what this court has said in Laker, what the First Circuit made clear in New Jersey is that once the district court and the plaintiffs have proven, have satisfied the burden to show that an injunction is necessary, the district court has discretion to enter an injunction that the district court believes is necessary and part of necessity has to be manageability to award the release. And the defendant's inability to propose anything narrower that would effectuate the same results is evidence that no narrower provision would be sufficient. Let me ask you if, as you say in your response to the 28-J letter, you gave authorities and district court to continue to modify an injunction while this appeal of a denial of an emergency stay is pending. If there were some material narrowing, then does that, how does that effect the stay appeal? Does that change the record so that we don't have a court looking, I'm sorry, how does that effect the appeal of the preliminary injunction if the injunction by that time is narrowed, then that appeal would be dismissed and there would have to be a new appeal? I think that there could be supplemental briefing on, I don't think you would need a new appeal, I think there could be supplemental briefing on the effect of that narrowing and whether it mooted out any parts of the appeal. So I do think if what this court believes is the best option here would be for the district court to take another crack at it, if the defendants, again, the only, I hear the termination provision being the main hangup, and again, the defendants have not identified anything they actually want to do that would be legal and prohibited by this prohibition, but if they do have that and this court thinks that it should go back to the district court, I absolutely think this court could say, look, we are staying, for example, continue the administrative stay that it entered, so we are not staying any of the provisions that were already agreed to because we want to make sure that the whole agency isn't laid off in 30 days or in waves, crucial parts of it aren't laid off, we want to make sure the contracts aren't finally canceled, we want to make sure all the data isn't deleted, so we are going to keep at least those provisions in place and continue the stay and encourage, you know, and that will continue, you know, until or less than until the district court enters some order modifying the injunction to encourage the defendants to go back and ask for that. Since you mentioned the administrative stay.  Could you live with a stay pending appeal that has the conditions that we put in the administrative stay? Yes. I think we could just extend. Yes, I think we could live with that pending the resolution of the merits of the appeal. You know, both sides have been living with that for about two months. I think, you know, especially we're very happy to, you know, consent to an expedited appeal. I suspect the defendants are as well. If this court were to grant that, but I think, you know, the extending exactly what this court did pending this argument. Is it the plaintiff's position that the government cannot even put subsets of employees on? Sorry, I just managed to make my chair. To put any employees on administrative leave, if they were just people you thought we're not going to need them, it's going to be bad for morale if they're sitting twiddling their thumbs, have a certain, you know, the last ten people that are in enforcement because we're not going to do that kind of, you know, we're going to deprioritize that kind of  And the 20 other people that already do that are going to be sufficient. That's if they're starting to make those more nuanced judgments and want it, but side rail some people. That's not, as you understand it, permitted under the current injunction. I think it depends on what they're doing. What the current injunction prohibits essentially is reaffectuating a stop work order via the use of something else that's not called a stop work order. So administrative leave. You know, I think if this court is concerned. And we've clarified that that would be like a wholesale, broad based stop work. Yeah. As opposed to something more tailored to as the priorities are being put into place under the new director, assuming he's soon confirmed. I think that's right. I mean, I will say the reason one of the reasons in the record that the defendants issued a stop work order initially instead of putting everybody on administrative leave is because there are statutory limits on administrative leave. Those aren't part of this case. So I think if this court wanted to stay if there was concern about the administrative leave provision if this court wanted to stay that or to make clear that what it means is using a broad based administrative leave that would be equivalent to a stop work order. I don't think we would have any objection to that pending the resolution of the appeal. We couldn't find any, but I'm wondering if places are aware of any similar types of injunction that was imposed against the federal agency in the past and what the litigation around that if there was such an injunction. That played out. I believe a very long time ago there was and I believe it only made it through the district court. I don't I can't recall whether I don't believe there was an appellate decision ever. But during the Nixon administration, my understanding is the only time that anybody has ever attempted to shut down an agency. And it was quite different, but I'm happy to I can't remember the name of that case, but I'm happy to one, make sure that I'm actually correctly remembering that. And if so, I'm happy to submit it. But I think that's right. And I think the reason for that is because this has never happened before. We are aware of I am aware of no instance before before this happened of enacting non Senate confirmed director of an agency trying to shut down an agency that Congress created within a week. So that it was shut down before a Senate confirmed director could even come in. The reason I think there aren't cases about this is it has never happened before. Even in this administration, you're saying this is the first. I think USAID might be similar. And that litigation is still is still ongoing. The challenge there was different. So so I, you know, and so it had different features. But but I and the government there was contesting it here. What we have is a factual record from the government's own witness. That, in fact, that is exactly what happened. And I'm aware of no case, even in this administration that has that factual record from an evidentiary hearing on a preliminary injunction. I think that's why, you know, we haven't seen it yet. It's just the first case to have presented presented the situation. But if you broaden the lens to not agency shutdown cases, but cases where a party against the government is faced with a situation that looks like wholesale mismanagement, unlawful acts, right? Tries to use the APA as a vehicle for, you know, something that looks like a structural injunction, which is normally the polar opposite of an APA case, which is, you know, it starts as an appellate proceeding. It's on the record. There's a discrete legal issue. The agency lays bare a legal error and then remands to the agency. We're like the opposite extreme already. I can think of one, which is Cobell, which, you know, was not a happy experience for this court. So a couple of things on that, you know, in the APA context, the way these cases usually arise is we think that you are, SUA, for example, is an example. You are told, you know, not to impair some environmental agency. And we think your version of what it means- SUA is an example and the bottom line is not on the- Well, right. But I want to make clear the reason that that is quite different from this case. And there, you know, what the challenge is essentially don't impair some, you know, geographic area, the environmental sanctity of some geographic area. The agency thought not impairing it meant one thing, and the plaintiffs wanted them to do something else. So that was a challenge to the way in which the agency was, as a policy matter, implementing a statutory command. And that's virtually, you know, all of the APA cases. When you think about it, that's what's going on here. That is absolutely not what's going on. The district court is not trying to tell the agency, you know, you are not supervising the right banks. You are not enforcing the right laws. You're not bringing enough enforcement actions or too many enforcement actions, or, you know, your regulations have to be X or Y. None of that is happening here. This is very different than any of those cases. What this is, is you are just shutting down the agency. You are just not doing it. You have no authority to shut down the agency. It's also why this isn't just an APA case. It's a, you know, direct constitutional separation of powers case. I'm assuming it's a statutory case, but- I'm sorry? It's a statutory. I mean, you'd say it's constitutional, but the constitutional violation is failing to follow statutes and the Take Care Clause. And that's just Dalton versus Specter. I don't- Just on the characterization, is it constitutional or statutory? Sure, I don't think so. I think this is what Dalton makes clear. And we're now far afield from anything this court has decided, but just to answer, you know- And I don't want to put on the table, you know, is this direct, again, to the president. Sure, but just to answer your question about Dalton, you know, what was at issue in Dalton was there was authority to do a thing. And the question was, did the president do that? It was closing Enable, basically. Did the president abuse its discretion in exercising the authority that Congress has needed to give it? And Dalton makes really clear that that's a different situation than when the executive does something without any statutory authority. And that's what's going on here. There is no statutory authority. That's what makes this a Youngstown situation as opposed to a Dalton situation. And Dalton explicitly gives this distinction in the case. There's just no statutory authority for the executive to shut down the agency. So it's like, you see the separation of powers issue. Mr. McArthur was saying in his opening that, you know, yes, the government does have authority to have a plan. And he characterizes with the plan that President Trump had announced to shut down this agency, being a plan to go to Congress and seek rescission of, you know, the CFPB authorizing statute. So the fact that the president, the fact that the administration has not done that is, in your view, a violation of separation of powers, because that's the way, the only permissible way to access. That's right. Yes. I mean, I just, on the framing, does seem to me like one respect in which your case is framed, that is a source of difficulty. This does seem to me like SUA in the sense that you are, in order to create the unlawful agency action, that is the focus of your case, which is the shutdown order. You're building that up from individual pieces that could not support review, right? An employee couldn't go to district court in the APA, through the APA and ask for an order, don't fire me. Right. That's like a channel through the CSRA, right? That would just not even get into court. Potentially, I think, but. I mean, I think, and, you know, the funding, funding is another piece of this. If you went into district court and asked for an order in the APA to, you know, direct the agency to seek more funds, you'd run headlong into the statute that deems the funding level to be within the discretion of the director. And so you have all these discretionary, discreet acts that don't support review, that you're trying to stitch together to create, you know, the reviewable action, which you say is the order to shut down the agency. I don't, I understand. I mean, I'm presaging the merits of the SUA issue. Right, which they didn't, government didn't raise, but it may be, you know, that aspect of the case, maybe why we're struggling with the remedial aspects of like, how are we going to, you know, RIFs are lawful, how are we going to, contract terminations are lawful, how are we going to manage those kinds of agency actions, which won't normally support an APA challenge. I think there are a few answers to that. So one, APA challenges are, you know, commonly based to on, you know, a decision that is then effectuated in multiple ways. The challenge here is to the decision to shut down the agency. And the preliminary injunction is just explaining the, mirroring the actions that the defendants actually took to effectuate that decision. It is not, you know, it's that. Which would not themselves be challenged. I'm not sure if that's true. I mean, we would, I think we could, we would brief that if the government had raised it and maybe they'll raise it on the merits appeal, but we haven't and could brief that. But I do think that for the APA purposes, there are plenty of cases where decisions are implemented through specific means, as opposed to something that's saying, you know, I don't like that you did this and I don't like that you did that. And it is somehow separate. You know, I think that's quite a different thing. And there are cases about that. So, and second, you know, under the law in this court, it's clear that whatever is true under the APA, that doesn't apply to a separation of powers, direct constitutional challenge. That doesn't, you know, the APA can't somehow withdraw from this court, the power to determine whether the administration is complying with the constitution. Thank you. Thank you very much. We'll hear a rebuttal, but let me just say before we do, I'm assuming that some people in the gallery have not been in the federal court argument before. It would be appropriate to refrain from nodding or shaking heads or making other expressions of approval or disapproval of what counselors are saying when they're. Thank you. And did Mr. McArthur reserve time? How much time? All right. I just have two points that I'd like to respond to that Ms. Bennett made. The first is toward the beginning of her argument, she talked about cases saying that there are certain circumstances in which courts can appropriately enjoin lawful conduct. I think that was an idea that first surfaced in their 28J letter. And I looked at the cases that they were citing and those cases involve permanent injunctions after there's been a final adjudication that a private party had violated the law. And even those cases recognized that even in that context, that is very much the exception to the rule of Taylor. Very different circumstances and factors are at play when you are talking about an injunction intruding on the executive branch's operation of its internal affairs. I understand the distinction you're making between private and governmental parties being enjoined, but it would seem that your other distinction that those are permanent injunctions actually cuts in favor of the point that she was making up a preliminary injunction and preliminary it's temporary and often is changed, nuanced, narrowed. I have the opposite instinct about that, Judge Billard, which is at the preliminary injunction stage, there hasn't yet been an adjudication that anyone has violated the law. There's been a first preliminary look at the merits. But I do think that even more important point there is about the executive branch, because what happened here is the district court in an effort to stave off what it considered a separation of powers violation, itself committed a separation of powers violation. The other point I want to respond to is on the balance of harms. And this is why Judge Katz says we really cannot live with the status quo under the administrative stay. And it also goes to a point in their opposition brief that I think is just flat wrong. They said on page three that this injunction does not dictate policy decisions. It manifestly does. Decisions about the size of an agency's workforce, about the discretionary work that employees should or should not undertake. Wait, how does it do the latter? Size of the workforce may be an issue, but what has addressed the discretionary work? I think this goes to your questions about the scope of four. And four is not entirely clear, but I think under the plain language of four, you could read that language to say that we can't issue a stop work order to employees who are performing entirely discretionary work. For example, there are close to 1,000 employees working in enforcement and supervision. If we read that as the plaintiffs do, which is to say not that nobody in the agency can stop any employees from working, but rather that there can't be a broad, effectively she's referring to the February 10th, 2025, stop work order. And if we read this to say no wholesale indiscriminate kind of. If it were read and clarified in that fashion that made clear that we could tell employees that are performing purely discretionary work, stop work, and we're putting you on administrative leave, I agree that problem goes away. But still, these kinds of decisions about size of the workforce, about resource allocation. Can you live with the administrative stay subject to the conditions with paragraph four clarified along the lines? Judge Pillard. Subject to the conditions that we discussed earlier, Judge Katsas, about not. We take our administrative stay and make it a stay pending appeal with the conditions in the administrative stay. No, specifically the parts that we can't live with are the inability to terminate employees, to conduct a RIF, or to terminate contracts. And that's because that goes to, as I mentioned before. Okay, I get the RIF point. On the contract termination point, what's your response to your friend's point that as a practical matter, you can stop all work and stop all expenses from accruing and payments from accruing. You just can't take the contract off your books until we decide the appeal. I think we just have a different understanding of how that works. My understanding is as long as they're on the books, there are certain costs that we may still be on the hook for. If, for example, a particular contract has a minimum service requirement, then we couldn't under the terms of the contract issue the sort of stop work order that the district court thought that- It may be limited. It may be, it may bear supplementation, but my understanding, my reading of the record is that it doesn't include anything supporting what you just said. That it's the only, it's limited, but what's in the record says, if you stop a contract, you don't have to pay. That that's an available posture. And it may generally be true that if you stop certain work, you don't have to pay for that work. But if you have anything to the contrary, I guess I'm just asking. I'm not aware of anything in the record. I have a question about in the winding down of contracts, there's a term that might be useful to you vis-a-vis employees, which is, this is paragraph seven, allows work under contracts to be halted based on an individualized assessment that the contract involved is unnecessary for the agency to fulfill its statutory function. And if you had the authority to put people on administrative leave and authority to discharge people based on a determination that their employment is not necessary to fulfill the statutory obligations of the agency, is that why would you not be able to live with that? That would certainly be far better than what we have now. I mean, my concern goes into part in part to how that would be enforced. And that's, I think, part of the problem with number seven. Even the individualized assessment part is problematic because that means we're now subject to potential contempt proceedings about whether we in fact conducted an individualized assessment. And if even if so, whether the decision to terminate the contract or to halt the work was based on that individualized assessment. That's just, there's no world in which a federal court should be superintending those determinations. But even if we go back, Judge Katz, as to just the RIF. Okay, this is a key presidential initiative. There is a February 11th executive order telling all executive branch agencies to take action to institute large scale reductions in force. There is a joint OPMOMB memorandum on this, which is what I understand would be the framework that would govern if the Bureau were to undertake a RIF. And it talks about reductions in force that eliminate to the maximum extent possible functions that are not required by statute or other law. That is a key presidential policy initiative that has been stopped dead in its tracks at the Bureau as a result of this injunction. And every day that that injunction remains in force, preventing the Bureau from carrying out that initiative through lawful acts, inflicts irreparable harm on our democratic system of government. And that's why the harms here are sharply in the government's favor, because there's nothing remotely comparable. On the other side, they're talking about employment related harms, which almost by definition are not irreparable. So the employees, I think the fundamental harm, and I'm focused more on the organizational plaintiffs. The fundamental harm is that the work that the agency does, that Congress established and mandated to do the work, protects the public, elders who are being offered things and told there's no cost to them. And in fact, they're agreeing to many hidden fees or somebody who takes out a loan and doesn't realize that they're a home improvement loan and doesn't realize that their entire home has somehow become collateral and then they're foreclosed on. I mean, it's the public. There are irreparable harms that have been documented in the record in this case, including harms like foreclosures, which are textbook irreparable harms. There are important public interests at stake to be sure. Including irreparable harms that have been shown and found by the district court, no? I'm not sure any specific thing has qualified in my mind as grave and irreparable. These are people who consume government services, okay? These are people like you and I who have credit cards, who have car loans, who have mortgages, who operate in a world in which we expect economic transactions to be non-fraudulent and disclosures to be honest. My understanding of the irreparable harms that they're pushing on behalf of their organizations are harms as consumers of the services that the Bureau provides. And I don't think they've shown that there's any discrete service that if this injunction is stayed, they won't receive, let alone that if they don't receive it, it will be a grave and irreparable harm that could outweigh the serious harm to our democratic system of government that I outlined just now. And my admonition that people are missing the forest when counting a few of the bushes around the edges is equally applicable to the plaintiffs. Anything else? What's your answer? On the riff, if I raised the idea of trying to split the difference and allow riffs if and only if they're not disabling, what's your response to your friend's objection that that is the one and only thing you told the district court that it couldn't do? We told the district court that it couldn't- Could not enter an injunction prohibiting riffs that would disable the agency from performing mandatory statutory functions on lack of administrability. I'm not aware that we did say that to the district court, so I think I'm not in a position to respond. Thank you, Your Honor. Thank you all very much.
judges: Pillard; Katsas; and Rao